ATCHISON, T. & S. F. RY. CO. et al. v. WHITE. (No. 1017.)*

(Court of Civil Appeals of Texas. Amarillo. June 7, 1916. On Motion for Rehearing, Oct. 11, 1916.)

1. CARRIERS ⟷218(5)—LIVE STOCK—ACTION FOR INJURY—LIMITATION—FAILURE TO READ CONTRACT.

A shipper of live stock, who had made a shipment over the defendant's line about once a week for a number of years, and who knew that the carrier was relying upon the terms of a written contract which he would be required to sign, and who had never shipped without signing such contract, though he had never read the contract

as he might have done, his failure to read it and learn of a 6 months' limitation of action for damages to stock, was such negligence that he could not be heard to dispute the contents of the contract.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 674–696; Dec. Dig. ☞218(5).]

2. CARRIERS ☞218(5)—LIVE STOCK—ACTION—LIMITATION—VALIDITY.

Where a shipper is furnished cars for a shipment of live stock, without requiring him to sign any written contract, and a contract is presented to him for signature after the stock is in the car and about to start, and where he or the person signing it does not know its contents, and has no time to read it, and signs to secure passes to attend the stock, such contract would not be a contract of the shipper, and the limitation restricting liability of the initial carrier to damages on its own line is not binding.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 674–696; Dec. Dig. ☞218(5).]

3. CARRIERS ☞218(1)—LIVE STOCK—ACTION FOR INJURY—LIMITATION.

A contract for the shipment of live stock containing a provision that a suit for damages thereto should be instituted within 6 months after the damage, and that a failure to do so would be conclusive evidence against the validity of any claim, was valid as to an interstate shipment under the law existing at the time of the shipment in February, 1913.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 674–696, 933–935, 939; Dec. Dig. ☞218(1).]

On Motion for Rehearing.

4. CARRIERS ☞228(5)—LIVE STOCK—DELAY—ACTION FOR DAMAGES — EVIDENCE — CONTRACT.

In an action against carriers for damages to a shipment of live stock by reason of the delay in transportation as the result of which the stock did not get time to rest and fill, which it otherwise would have had, evidence held to show merely the shipper's request for cars as required by Interstate Commerce Act (Act Cong. Feb. 4, 1887, c. 104, 24 Stat. 379) § 1, as amended by Act Cong. June 29, 1906, c. 3591, § 1, 34 Stat. 584 (U. S. Comp. St. 1913, § 8563, subd. 2), and a promise by the agent to get them if he could and not to show the elements of a contract.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 960; Dec. Dig. ☞228(5).]

5. CARRIERS ☞218(1)—INTERSTATE COMMERCE—FURNISHING CARS.

Where cars were furnished on request for an interstate shipment of live stock, as required by the Interstate Commerce Act, the conditions in the contract as to the carriers' liability are controlling.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 674–696, 933–935, 939; Dec. Dig. ☞218(1).]

Appeal from District Court, Lipscomb County; Frank Willis, Judge.

Action by C. R. White against the Atchison, Topeka & Santa Fé Railway Company, and the Panhandle & Santa Fé Railway Company. Judgment for plaintiff, and defendants appeal. Reversed, and judgment rendered that plaintiff take nothing by his suit.

E. C. Gray, of Higgins, Hoover & Dial, of Canadian, and Terry, Cavin & Mills, of Galveston, for appellants. Adkins & Sewell, of Higgins, for appellee.

HUFF, C. J. The appellee White sued the appellants for damages sustained in a shipment of cattle. He alleges that he delivered 382 head of cattle to the initial carrier, the Panhandle & Santa Fé Railway Company, at Higgins, Tex., for shipment to Wichita, Kan., on the 22d day of February, 1913; that the cattle were sold to one Frederick, to be delivered at Wichita, for the price of $6.90 per cwt. for 343 head, and $6 per cwt. for the remaining 39 head of cattle so shipped. These cattle, under the contract of sale, were to be delivered and weighed at 10 o'clock a. m. on the 24th day of February, 1913; that the cattle left Higgins at 11 o'clock p. m. on the day of shipment, and that the Southern Kansas Railway Company of Texas, whose name is admitted, was changed to the Panhandle & Santa Fé Railway Company, issued a bill of lading or contract for the transportation of the cattle; that the agreement between White and Frederick was that the cattle should be shipped in time to rest and "fill" before being weighed, of which agreement White notified the agent at Higgins and of the importance of getting the cattle to Wichita in the usual and in a reasonable time. It is alleged the trip was not made in the usual time or within a reasonable time, and as a result thereof the cattle did not get the rest and fill which they otherwise would have had and taken on; that if the cattle had been transported within a reasonable time they would have arrived at Wichita 6½ hours earlier than they did; and that the appellants permitted the cattle, after arriving, to remain in the cars about 2 hours before unloading them. These acts are alleged to have been negligence on the part of the appellants, by reason of which the cattle did not get the fill they otherwise would have taken on, which would have amounted to 38 pounds per head, and that the cattle lost about 8 pounds in addition to the fill, by reason of unnecessary delay and the failure to deliver the cattle at Wichita in the time in which they should have arrived.

The appellants filed a joint answer, with general and special exceptions, and specially, among other things, pleaded the execution of the bill of lading or contract, setting up several special provisions, among which, that the cattle were not to be transported to market in any particular time or by any particular train; that no suit could be maintained unless the same should be commenced within 6 months of the date of the injury.

The appellee replied that this contract was without consideration; that he had made an oral contract for the shipment; that after the cattle were loaded and ready to start on the trip, the contract was presented to him to sign; that he did not read the same and could not have done so in the time required, and that he did not know its contents; that he signed for the transportation of himself

with the cattle and his return with all the usual allegations that go with such pleas to this class of contracts.

The eighth and fourteenth assignments are based on the refusal of the court to give the second specially requested charge of appellants and their exception to the main charge of the court, on the ground that the appellee was bound by the written contract with reference to the time in which suit should be instituted. The shipment was made February 22, 1913. The cattle arrived at Wichita February 24, 1913. The suit was filed February 12, 1914; more than 6 months after the alleged damage. The ninth provision in the contract relied on is as follows:

"It is further agreed that no suit or action against the company for the recovery of any damages accruing or arising out of said shipment, or of any contract pertaining to the same, or the furnishing of facilities for such shipment, shall be sustained in any court by law or equity, unless such suit or action shall be commenced within 6 months next after the loss or damage shall have occurred. The failure to institute suit within said time shall be deemed conclusive evidence against the validity of such claim or cause of action, and shall be a complete bar to such suit."

The charge requested by the appellant is as follows:

"The defendants ask the court to charge the jury that under the circumstances in this case the plaintiff failed to institute this suit within the time prescribed by the limitations of the contract, and therefore plaintiff is not entitled to maintain this suit, and your verdict should be for defendants, and you are instructed to return a verdict for the defendants."

The trial court instructed the jury that under the written contract the jury should find for the defendant, unless by a preponderance of the evidence the initial road received the cattle for shipment, and furnished cars for that purpose, without demanding a written contract of White, and after the cattle were upon the cars and the train about to leave, the contract was presented to the shipper for signature, and if they further found that the shipper did not know the contents of the contract, and had no time to read it and sign it under these conditions, in order to secure a pass to attend the cattle, in such event the written contract was not binding upon the shipper.

Appellants timely excepted to the charge. The appellee White testified on this point, on cross-examination:

"I stated that I have been shipping cattle for about 13 years over this road, and at this particular time I think I have been in the habit of making the shipments about once a week. Prior to the time I shipped these cattle I always was required to, and always expected to, and did, sign a contract under which they were shipped. I knew that is customary and that was required in order to get transportation. I knew that the railroad company only accepted and shipped cattle under a contract; I knew we always signed a contract for transportation about a minute and a half before we started and after the cattle were loaded (shows witness contract). I signed that contract; I carried that contract on the train with me, and that is the same kind of a contract that I always signed. I had those contracts in my possession until I got to Wichita, and if I went to Kansas City I had them in my possession until I reached there. If I went every week I had those contracts in my possession lots of times."

On redirect examination the witness stated that he signed the contract after the cattle were loaded, but there was nothing said about the contents of the contract at the time he was arranging for the cars at the time they were loaded; that the train was ready to go when the cattle were loaded and he ran up to the depot and signed the contract and left; that he did not know the contents of this instrument when he signed it. He was not given time to read it; that he always signed these contracts for transportation and gave them to the conductor and he punched them the same as he does a ticket.

On recross-examination he states:

That he did not ask time to read the contract; that he could read; that he could read while testifying. "I did want time to read it. When I ordered the cars, and when I got into the caboose, I knew it would be required of me to sign one of these, such as I had been signing. I could have read one of these contracts at different times on the train. I did not think it was necessary to read it. So far as I know, every contract I signed was just like this, so far as I know."

[1, 2] In the original petition appellee alleged:

"That the time said cattle were delivered to the Southern Kansas Railway Company of Texas, said defendant issued to plaintiff a receipt or bill of lading therefor, whereby said defendant acknowledged delivery of said cattle for transportation, as aforesaid."

And then alleged that the same was taken up and in the possession of appellants, and demanded its production on the trial, or parol evidence would be offered of its contents. It is only in the supplemental petition that he alleges an oral agreement to furnish cars, and the reception of the cattle by appellants, and the loading of them on the cars before issuing the receipt therefor. We believe, however, in his original petition, that this cause of action is based on the written contract, and the evidence of appellee clearly indicates, we think, that he brought his cattle to the shipping pens with the understanding and knowledge that the written contract for transportation would be required. The fact that he did not read it should not, under such circumstances, defeat the appellant's rights thereunder. Knowing that he must sign it and that he would do so, and that appellant required a written contract before shipment, for the transportation of the cattle, he ought not to be permitted to say that he is not bound thereby, because he did not know its contents. His secret purpose could not make a contract, especially so when he knew the appellant was relying upon the terms of the written contract, which he was, and would be, required to sign, and which he did sign. For 13 years he had been shipping cattle over the appel-

lant roads, and lately had been shipping every week, and had never shipped without signing and making such contract. Even though he had never read one he certainly in that length of time ought to have done so, when, by his admission, it is shown he could have done so. Railway Co. v. Adams, 182 S. W. 365; Turner v. Henderson, 183 S. W. 51; Railway Co. v. Halsell, 36 Tex. Civ. App. 522, 81 S. W. 1243; Railway Co. v. Wright, 24 Tex. Civ. App. 291, 58 S. W. 846. The courts have, in certain cases, relieved the ignorant and those who could not know; but where they do know the contents of the written contract, or should have known by the use of reasonable diligence, we do not think they are relieved. Our Supreme Court said:

"If the Southern Pacific Company received the horses for shipment, furnishing the cars for that purpose, without demanding any written contract of the parties, and, after the horses were upon the cars and the train about to leave, the contracts were presented to the men in charge, or to the shipper, for signature, and if the shipper or the person who signed them did not know the contents of the contracts, and had no time for reading them, and signed them under these conditions in order to secure the passes to attend the horses, such contracts would not be the contracts of the shipper, and the limitation which restricted the liability of the railway company to damages accruing on its own line was not binding upon the shipper. Railway Co. v. Grant, 6 Tex. Civ. App. 674, 26 S. W. 286; Railway Co. v. Withers, 16 Tex. Civ. App. 506, 40 S. W. 1073; Railway Co. v. Carter, 9 Tex. Civ. App. 677, 29 S. W. 565." Railway Co. v. Meadors, 104 Tex. 469, 140 S. W. 427.

This court, in several cases, has recognized the above rule; but in order to invoke the rule it must have been a contract for the transportation upon the oral agreement. It occurs to us there could have been no such contract in this case for the reason when the cattle were delivered appellee knew he would have to sign the written contract; that the appellant would require it; had always done so with him and he did sign exactly what he had expected to sign, and the cattle were transported on that contract. In this instance, whether he read or did not read it made no difference. He will not, on such negligence, be heard to dispute his engagement entered into in writing. Under the facts of this case the trial court should have instructed a verdict for the appellants, as requested.

[3] The contract as to the time in which the suit should be instituted is valid in interstate shipments under the law as it existed at the date of the shipment. Railway Co. v. Harriman, 227 U. S. 657, 33 Sup. Ct. 397, 57 L. Ed. 690, and the recent case of Northern P. R. Co. v. Wall, 241 U. S. 87, 36 Sup. Ct. 493, 60 L. Ed. 905.

The judgment of the trial court will be reversed and here rendered that appellee White take nothing by reason of this suit, and that appellants recover their costs in this court and in the court below.

Reversed and rendered.

## On Motion for Rehearing.

[4] The appellee White has filed an earnest argument with his motion for rehearing, insisting that the facts in this case show an oral agreement to ship the cattle. We have again gone carefully over the testimony and feel assured that our conclusion in the original opinion is correct. The testimony of the original order for the cars, in the light of the Interstate Commerce Act, occurs to us does not amount to an agreement. White, in addition to his testimony set out in the opinion, testifies that he ordered the cars of Johnson, the agent of appellant for the shipment of the cattle, before delivering them. He thinks he ordered over the phone when he sold the cattle in the pasture.

"I told him that I had sold the cattle, to be weighed in Wichita, at a certain time, 10 o'clock Monday morning, and I wanted a special run. Then I went to town that evening. I believe the next morning, in company with A. J. Hill, I went to the depot to see Johnson. I met him on the platform. I stated the trade I had made with Frederick. Johnson told me he would do the best he could for me. He would get the best run he could for me. He called me up 3 or 4 days later, over the phone, and told me he could not get it for me. I would have to go on the regular pick-up. I told him I had sold about 400 head of steers to Frederick, to Wichita. I don't believe I told him anything about the price. I told him I sold them to him to be delivered at Wichita, to be weighed at 10:30 Monday morning. I was to fill them," etc.

The most that may be said of Hill's testimony, on which appellee so much relies, is that White told Johnson about his trade and what he wanted. Johnson "agreed that he would try to get a special run for the cattle." White admits that Johnson afterwards told him he could not get that run and that he would have to "go on the regular pick-up." It occurs to us this does not meet the terms of an agreement for shipment. It was simply an order for cars. Johnson agreed to nothing, but that he would try to get a special run, which he afterwards notified appellant he could not get. The appellee, nevertheless, brought in his cattle for shipment. He did so knowing he would be required to sign the contract he did sign. After 20 years' experience as a cattle shipper and 13 years' over this road, he must have known that the contract would answer the purpose of transportation for the caretaker, and also that it was a contract for the shipment. White's testimony as to what was said and done before the shipment between him and the agent, shows no more than a request for cars, as provided for in the Interstate Commerce Act. Section 1, as amended by Act Cong. June 29, 1906, § 1 (U. S. Comp. St. 1913, § 8563, subd. 2), thereof provides:

"And it shall be the duty of every carrier subject to the provisions of this act to provide and furnish such transportation upon reasonable request therefor."

The act defines "transportation" as including all cars, instrumentalities, and facilities of shipment in connection with the receipt

and handling of property transported. When White ordered the cars for interstate shipment it was the duty of the railroad to furnish them under the federal act. Furnishing them did not make a contract, but it was a duty imposed by the law. This testimony does not show the elements of a contract in our opinion, and especially when it was understood by White he would be required to enter into the contract. Congress has taken charge of interstate shipments from the time a request is made for the cars until final delivery under the contract of shipment.

[5] Furnishing cars for the shipment of property is within the federal act, and the conditions in the contract of shipment as to liability is controlling. Railway Co. v. Prescott, 240 U. S. 632, 36 Sup. Ct. 469, 60 L. Ed. 836.

The motion for rehearing is overruled.